UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60011-CR-ROSENBAUM/Snow

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ANDRE D. BARBARY, et al.,

      Defendants.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Defendant **Nathaniel Holt, Jr.'s** Motion to Suppress Stop and Search of Vehicle and Seizure of U.S. Currency on June 27, 2007 (DE 225) and Motion to Suppress Stop and Search of Vehicle of U.S. Currency on January 7, 2010 (DE 226), which were referred to United States Magistrate Judge, Lurana S. Snow, for Report and Recommendation.

Defendant **Nathaniel Holt, Jr.** is charged by Indictment with conspiracy to distribute and to possess with intent to distribute oxycodone and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846  and 841(a)(1) (Count One) and conspiracy to use telephone and cellular telephone facilities to commit drug felonies, in violation of 21 U.S.C. §§ 846 and 843(b) (Count Two).  He seeks to suppress evidence seized as the result of two traffic stops in 2007 and 2010. The motions are fully briefed and an evidentiary hearing was conducted on July 19, 2012.  The motions are ripe for consideration.

## I. EVIDENCE PRESENTED

The Government's first witness was Lee County Sheriff's Detective Raul Fernandez. Detective Fernandez testified that he has been employed by the Lee County Sheriff for the past 4

years.  He began his law enforcement career as a Commander with the Florida East Coast Railway Police.  He next served from 1986 to 2000 as a detective with the Opa Locka, Florida Police Department, where he primarily worked in narcotics.  Detective Fernandez then worked for the United Nations for 2 ½ years, serving as Chief Narcotics Deputy in Kosovo.  He has been a police instructor for the United Nations and in Florida.

Detective Fernandez stated that he is assigned to the Central District in Lee County, Florida, which includes State Road 82, Palm Beach Boulevard and I-75.  On June 27, 2007, Detective Fernandez was patrolling on Ballard Street, off Ortiz Avenue when he observed a car traveling eastbound at a high rate of speed.  His radar unit indicated that the car's speed was 59 miles per hour, 29 miles per hour above the posted speed limit.

Detective Fernandez stopped the vehicle and approached the driver (later identified as the Defendant), who was the vehicle's only occupant.  The detective asked the Defendant for his license, and noticed that the Defendant was breathing heavily and sweating profusely.  The Defendant stared straight ahead and would not maintain eye contact.  When the Defendant produced his license, his hands were shaking. The Defendant gave a mumbled response when asked where he was coming from and gave no answer when asked where he was going.  Detective Fernandez suspected that there was contraband in the Defendant's vehicle.  He directed the Defendant to step outside the car so his hands were visible while the detective ran records checks.

Detective Fernandez explained that in any traffic stop, he routinely checks for warrants with NCIC and FCIC and runs a check on the license tag.  When he saw the Defendant's name, he recognized the Defendant from his service in Opa Locka.  The Defendant knew the Deputy's street name, which was "Pac Man."  At this time, Detective Fernandez requested assistance from a K9 unit.

Detective Fernandez instructed the Defendant to stand between the back of his vehicle and the front of the deputy's vehicle.  Detective Fernandez asked for permission to search, and the

Defendant replied that he could search the whole car.  When the detective began the search, he noticed that the glove box was locked.  He asked the Defendant if he could open it, but the Defendant responded that he did not want to.  Detective Fernandez stopped the search and began his paperwork.  When the Defendant started to pace back and forth with clenched fists and appearing agitated, the detective asked the Defendant to sit in the back of the patrol car.  Detective Fernandez explained that he did this for safety reasons because he was concerned that the Defendant might either flee or engage him.

As Detective Fernandez was completing the citation and field interview card, the K9 officer, Corporal Keith Dunn, arrived.  Detective Fernandez explained that it is discretionary with each officer whether to summon a K9 unit.  Corporal Dunn conducted a free air sniff with his narcotics dog, and the dog alerted to the passenger's side of the vehicle.  At that point, Detective Fernandez obtained the keys from the Defendant and opened the glove box, where he found a large amount of currency in banded bundles.  Corporal Dunn then requested another unit while Detective Fernandez took photographs of the Defendant's vehicle.

Detective Fernandez identified Government's Exhibit 1A, an affidavit he had compiled as a report; Exhibit 1B, photographs he had taken of the vehicle; Exhibit 2, the speeding citation and field interview card, and Exhibit 6, documents from the Lee County Clerk.  Detective Fernandez related that the vehicle was a rental with Indiana plates.  He explained that the tag check took longer because of the out-of-state tag and because he had to contact the rental agency to ascertain whether the Defendant was an authorized driver.

Detective Fernandez testified that he suspected the Defendant was transporting narcotics or currency.  He stated that the area of the traffic stop was a high crime area of Lee County where he had made numerous arrests for narcotics and weapons charges.

On cross examination, Detective Fernandez testified that during traffic stops, he routinely asks occupants to step out of their vehicles, unless they are elderly or otherwise seem

3

unable to do so.  He stated that although he believed that he had prior contact with the Defendant in Opa Locka, he did not know if the Defendant was incarcerated during the time he served with the Opa Locka Police Department.  Detective Fernandez also stated that placing the Defendant in the patrol car did not cause any delay.  He added that the license check came back just before the K9 unit arrived.  After the dog alerted on the vehicle, the Defendant was permitted to get out of the patrol car.  The deputy conceded that he did not have a search warrant and that he had requested the K9 unit before the Defendant refused to open the glove box.

On redirect examination, Detective Fernandez noted that the photograph of the Defendant had been taken after the dog had alerted and showed that the Defendant was not handcuffed.  He testified that the traffic stop took place at 4:15 p.m. and the field interview card was completed at 4:50 p.m.  At the time the K9 arrived, the NCIC and FCIC check had not come back.

Lee County K9 Sergeant Frank Glover testified that he has been a K9 officer for 12 ½ years and currently is the head K9 trainer.  He maintains records for all dogs at the Lee County Sheriff's Office.  Sergeant Glover stated that the dog assigned to Corporal Dunn is "Dax," who was acquired by the Sheriff's Office in 2006 and went into service at the end of that year.  Dax is a German Shepherd who received 400 hours of patrol training, after which he was trained for 60 hours in narcotics identification.  Sergeant Glover explained that each narcotics dog receives weekly training in 4-hour blocks, and must be re-certified annually.  All dogs are trained in the identification of marijuana, cocaine, heroine, methamphetamine and ecstasy. Corporal Dunn also must be certified, and both dog and handler were current and up-to-date in their training as of June 2007.  Sergeant Glover identified Government's Exhibit 8 as Dax's training reports, which indicated that he was 99.5% accurate in 2006; 99.9% accurate in 2007, and 100% accurate for the next three years.  Dax searched 15,612 items in his training, with only 5 incorrect identifications.

Sergeant Glover testified that Lee County K9 Sergeant Steven Brady is assigned to narcotics dog "Guinness."  He identified Government's Exhibit 14a as Guinness' training records.

Guinness also is a German Shepherd, and he received 233 hours of training for patrol and 102 hours for narcotics detection.  Sergeant Glover explained that Guinness' training period was shorter than that of Dax because Sergeant Brady already had received K9 training.  Guinness' training records reflect an accuracy of 99.9-100%, with only 3 incorrect identifications in training exercises.

On cross examination, Sergeant Glover testified that Corporal Dunn and Dax were deployed at 4:33 p.m. on June 27, 2007.

Corporal Keith Dunn testified that he has been employed by the Lee County Sheriff's Office for 13 years and has worked with Dax since 2005.  He stated that on June 27, 2007, he was called to respond, by Detective Fernandez at 4:33 p.m..  He conducted a search of the Defendant's vehicle with Dax, who alerted by sitting down beside the front passenger door.  A search of the glove box revealed U.S. currency.  He identified Government's Exhibit 3 as the Detection Incident Detail Report for that incident.

Detective Steven Kirkby testified that he has worked with the Lee County Sheriff's Office since June 2005 and is assigned to the interdiction unit.  He also is a K9 handler.  Detective Kirkby testified that on January 7, 2010, he was part of a 5-man unit patrolling I-75 to the Collier County Line.  Sergeant Brady also was working that day.  Detective Kirkby explained that all members of the unit stay within 2-3 miles of one another.

While on patrol, Detective Kirkby observed a silver Honda go past him with a tag light that was not working properly.  Detective Kirkby related that a tag light must permit the tag to be read at night from 50 feet away.  Detective Kirkby approached within 20 feet of the vehicle and was unable to read the tag number or identify the issuing state.  He stopped the vehicle near mile marker 120, and walked to the car to make contact with the two occupants.  Detective Kirkby noticed that the driver (later identified as the Defendant) held his driver's license in his hand and was looking straight ahead, while the passenger was looking at the floor.  The Defendant's hand was shaking when he handed the license to Detective Kirkby.  The detective told the Defendant that as long as

5

he had a valid driver's license and no outstanding warrants, he would receive only a warning. Detective Kirkby testified that because he is not a traffic officer, it is his general practice to issue warnings rather than citations.

Detective Kirkby directed the Defendant to exit the vehicle.  Prior to complying, the Defendant leaned over and whispered something to the passenger.  Detective Kirkby then pointed out to the Defendant the defective light.  The Defendant responded that he would tell the owner of the vehicle, who was the passenger, to get it fixed.  Detective Kirkby then checked the Defendant's license with EPIC via his computer.  He stated that it was standard procedure in all traffic stops to run a check on the license and for warrants.

While Detective Kirkby was conducting the checks, he stood between the door of his patrol car and the car's interior, while the Defendant stood in front of the patrol car on the right side. Detective Kirkby engaged in casual conversation with the Defendant in an effort to put him at ease. He joked with the Defendant about the "money suit" (a leather suit with dollar signs on it) he was wearing, and asked what the Defendant was doing in the area.  The Defendant replied that he had arrived from Opa Locka the preceding day for the birth of his nephew's son and had stayed at his nephew's home.  Detective Kirkby asked how the baby was doing and what his name was, but the Defendant could not remember the baby's name.  Detective Kirkby noted that the Defendant's answers were vague and short, and that the Defendant stared at his own car without making eye contact with the detective.

Detective Kirkby then returned to the Defendant's vehicle to obtain the registration from the passenger, Mr. Mitchell.  Mitchell opened the center console, where the detective observed the vehicle registration, owner's manual and other items that usually are kept in the glove box.  As with the Defendant, Detective Kirkby engaged Mitchell in casual conversation. He asked where they had come from, where they were going and the purpose of the trip.  Mitchell replied that they were coming from Fort Myers where they had spent the day hanging around with friends.  Mitchell stated

6

that they had arrived in Fort Myers that day and did not mention any special occasion.  Eventually Mitchell located the vehicle registration and handed it to the detective.

Detective Kirkby became suspicious because the Defendant and Mitchell had provided different stories.  He ascertained that the Defendant was sure he had come the previous day for the birth of a child and had spent the night at his nephew's house.  The Defendant stated that he had not brought a change of clothes.  The Defendant also told Detective Kirkby that he was not responsible for anything inside the vehicle, which did not belong to him.  The detective asked the Defendant for consent to search the car, but the Defendant declined, reiterating that it was not his car.

At that point, Detective Kirkby called for backup for safety reasons, although he had his dog with him and could have conducted a free air sniff of the vehicle without assistance from another K9 officer.  The registration check then came back, indicating that the car was registered to Mitchell.  Detective Kirkby was still waiting for the other checks when Sergeant Brady arrived with his dog, Guinness.  Sergeant Brady conducted a free air sniff around the vehicle and Guinness alerted to it.  A search of the vehicle revealed currency in the glove box, as well as a St. Jude prayer card. Detective Kirkby testified that he had learned during his police training that drug dealers often carry St. Jude cards in the belief that prayer cards would ensure a safe journey.  The Defendant denied any knowledge of the currency and stated that it did not belong to him.

Detective Kirkby identified Government's Exhibit 9, a written warning issued to the Defendant; Exhibit 10A, a Confiscated Cash Record reflecting the seizure of $31,260.00; Exhibit 11A, a Confiscated Cash Record reflecting the seizure of $1,764.00, and Exhibit 16, a copy of the vehicle's registration.

On cross examination, Detective Kirkby acknowledged that the currency seized from the vehicle had been returned because the police had not connected it to criminal activity.  He stated that at the time of the stop, his only concern was the defective tag light.  However, his suspicions

became aroused when he learned that the Defendant had prior arrests for drug offenses and murder, even though there were no active warrants for him. However, the pivotal point was when he received the conflicting stories from the Defendant and Mitchell.

Detective Kirkby stated that he could have finished issuing the warning very quickly, but waited for the NCIC report and the results of other checks. He added that backup arrived within 2 or 3 minutes after his call. Finally, the detective testified that it is his standard practice to keep the driver out of the car until the stop is concluded.

Sergeant Steven Brady testified that he has been employed by the Lee County Sheriff for 17 years and has supervised the highway interdiction unit since 2009. He has been a K9 handler for 13 years and has had Guinness since the dog was 8 weeks old. Sergeant Brady is part of a unit which works as a team conducting criminal interdictions on I-75. He explained that often members of the team join one another during a stop even when backup had not been requested.

Sergeant Brady had Guinness conduct a free air sniff around the vehicle. He stated that Guinness actually alerted to the driver's door, although the currency was found in the glove box. The Sergeant identified Government's Exhibit 4, a Confiscated Cash Record dated June 27, 2007 on which his name was listed, although he was not in the highway interdiction unit then. The record reflected that $45,900 had been seized. He also identified Government's Exhibit 10, a form dealing with the forfeiture of currency, dated January 7, 2010.

On cross examination, Sergeant Brady testified that Guinness also had alerted to the currency seized from the vehicle. He further stated that the Defendant had claimed the currency which had been seized in 2010. Sergeant Brady related that the interdiction unit enforces all traffic laws even when they have no suspicion that other crimes are being committed.

The parties stipulated that the Defendant had been arrested for possession of cocaine on October 29, 1986; that he was sentenced to 4 years imprisonment, and that as a result of a parole violation, he remained in prison until March 30, 2005.

## II. DISCUSSION

The Defendant challenges the 2007 and 2010 traffic stops on the grounds that the length of each detention was unreasonable and longer than needed to issue a citation or warning, and that there was not reasonable suspicion to justify either K9 search.  Thus, the Defendant objects to both the duration and the scope of each stop.  He seeks to suppress $45,940.00 in U.S. currency seized on June 27, 2007, as well as 2 cellular telephones and a total of $33,024.00 seized on January 7, 2010.

The law is clear that "[u]nder the Fourth Amendment, a decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation occurred." United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999).   Moreover, "an officer's motive in making the traffic stop does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment.'" Id. (quoting Whren v. United States, 517 U.S. 806, 812 (1996)).  However, "an officer's investigation of a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003).  A traffic stop "is more analogous to an investigative detention that a custodial arrest," and "the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (emphasis in original).  The stop "may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity." Id. (quoting United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997)).  Once the officer conducting the stop develops reasonable suspicion of criminal activity, he has a duty to investigate further.  United States v. Hernandez, 418 F.3d 1206, 1211 (11th Cir. 2005).

## A. Stop on June 27, 2007

The Defendant argues that Detective Fernandez should simply have issued the citation and released him, and that the time spent questioning him and waiting for the arrival of the K9 unit

exceeded the time necessary to issue the ticket.  He cites United States v. Pruitt, 174 F.3d 1215 (11th Cir. 1999) for the proposition that the police may not engage in a fishing expedition in order to develop articulable suspicion of criminal activity.

In Pruitt, the court noted that an officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check and issue a citation.  Id. at 1219. Extending the detention for further questioning beyond that related to the initial stop is permissible only if the officer "has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring" or "if the initial detention has become a consensual encounter." Id. at 1220. A variety of factors may contribute to the formation of reasonable suspicion, including a subject having no proof of ownership of the vehicle or proof of authority to operate the vehicle, and inconsistent statements about destination.   Other significant factors are a subject driving with a suspended license or exhibiting reluctance to stop.  Id. The Court found that when an officer possesses only evidence of speeding, he is not entitled to extend the detention of the subjects in order to ask unrelated questions, such as what they did for a living and how much their van had cost.  Id. at 1221.

In the instant case, Detective Fernandez stopped the Defendant for traveling 29 miles per hour above the speed limit in a high crime area where the detective had made several arrests for drugs and guns.  Deputy Fernandez credibly testified that when he approached the vehicle, the Defendant was breathing heavily and sweating profusely.  The Defendant's hands were shaking and he stared straight ahead without making eye contact.  When asked where he was coming from, the Defendant mumbled his reply and did not answer the detective's question about where he was going. At that point, Detective Fernandez requested a K9 unit.

Detective Fernandez testified that his suspicions increased when he received the Defendant's name, which he recognized from his time with the Opa Locka Police Department.[1] Additionally, although the Defendant first gave consent to search the car, he then refused to open the glove box. While Detective Fernandez was completing his paperwork, the Defendant paced back and forth with his fists clenched. Prompted by safety concerns, the detective placed the Defendant in the rear of the patrol car.

At that point, Detective Fernandez suspected that the Defendant was transporting narcotics or currency. The K9 officer arrived before Detective Fernandez had received the results of all his records checks, which took longer than usual because the Defendant was driving a rental vehicle with out-of-state license tags. Once the K9 search was completed, the Defendant was allowed to exit the patrol vehicle.

The undersigned finds that by the time the K9 unit arrived, Detective Fernandez had an objectively reasonable, articulable suspicion that the Defendant was engaged in the illegal transportation of narcotics or currency. Prior to that time, the scope of the investigation was limited to the Lee County Sheriff's standard procedure for an ordinary traffic stop. Detective Fernandez obtained the Defendant's driver's license, asked where he was coming from and his destination and directed the Defendant to step out of the vehicle. He did not place the Defendant in his patrol car until the Defendant's behavior prompted safety concerns, and the Defendant was permitted to exit the patrol car after the K9 search had been completed. At no time was the Defendant placed in handcuffs.

Accordingly, the undersigned finds that until Detective Fernandez developed reasonable suspicion, the scope of the detention did not exceed that of an ordinary traffic stop.

---

[1] Although the parties' stipulation suggests that the Defendant was incarcerated while Detective Fernandez was employed by the Opa Locka Police Department, the undersigned credits the detective's testimony that he recognized the Defendant's name. In any event, Detective Fernandez had reasonable suspicion that the Defendant was engaged in other illegal activity without consideration of the name recognition factor.

11

Because Detective Fernandez had not completed all of the records checks prior to the arrival of the K9 officer, the undersigned also finds that the duration of the detention did not exceed that of an ordinary traffic stop. Therefore, there is no basis to suppress the currency seized from the Defendant on June 27, 2007.

**B. Stop on January 7, 2010**

As to the second traffic stop, the Defendant again argues that the detention was excessive in scope and duration. He contends that Detective Kirkby should have issued the warning and immediately released him.

The Government first contends that the Defendant lacks standing to contest the search because he was not the owner of the vehicle and repeatedly denied knowledge of, and control over its contents. The Government points out that cases in this Circuit have held that a non-owner passenger, with no possessory interest in a vehicle, does not have a legitimate expectation of privacy in the interior of the vehicle. United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008); United States v. Lee, 586 F.3d 859, 864-65 (11th Cir. 2009). Although the Eleventh Circuit has not ruled on the issue, other Circuits have held a driver who does not own a vehicle or is not named as a driver on the rental contract lacks standing to contest a search of the vehicle. United States v. Amaral-Estrada, 509 F.3d 820, 826-27 (7th Cir. 2007); United States v. Worthon, 520 F.3d 1173, 1182 (10th Cir. 2008).

In the instant case, the vehicle was registered to the passenger, Mr. Mitchell, and it was Mitchell who located and provided the registration to Detective Kirkby. The Defendant repeatedly stated that he did not own the car, could not consent to its search, had no knowledge of what was inside it and did not own the money that was seized from it. Considering these facts, the undersigned does not believe that the Defendant had a reasonable expectation of privacy in the vehicle and concludes that he lacks standing to contest its search. However, in the absence of clear

precedent to support this conclusion, the undersigned will consider the merits of the Defendant's argument.

Detective Kirkby credibly testified that he stopped the Defendant's vehicle for having an inoperable tag light.  He stated that when he approached the vehicle, the Defendant looked straight ahead and did not make eye contact, while the passenger stared at the floor.  Additionally, the Defendant's hands were shaking when he handed his driver's license to the detective.  Following standard procedure, Detective Kirkby asked the Defendant to step out of the vehicle.  He engaged the Defendant in casual conversation, including where he had been and where he was going.

Detective Kirkby did not become suspicious until he asked the same questions of Mr. Mitchell while obtaining the vehicle registration from Mitchell.  After repeating those questions to the Defendant and verifying that the stories clearly were conflicting, Detective Kirkby requested backup.  His suspicions increased when he learned that the Defendant had been arrested on narcotics and murder charges. When K9 Sergeant Brady arrived, Detective Kirkby instructed him to conduct a free air sniff around the vehicle.

As noted above, the Pruitt court stated that an objectively reasonable suspicion of illegal activity may be based on inconsistent statements about destination.  Pruitt, 174 F.3d at 1220. In the instant case, the answers provided by the Defendant and Mitchell differed in several respects. The Defendant stated that he had left Opa Locka the preceding day to visit his nephew on the occasion of the birth of a child.  Mitchell, by contrast, told Detective Kirkby that they had driven up the same day and made no mention of any special occasion.  Additionally, the Defendant did not know the name of the newborn he purportedly had driven for several hours to see.  These statements were made during the time that Detective Kirkby was conducting his license and records checks, and the routine questioning did not prolong the stop.

Under these circumstances, the undersigned finds that by the time Sergeant Brady arrived with Guinness, Detective Kirkby had an objectively reasonable and articulable suspicion that

the Defendant was engaged in illegal activity.  Prior to that time, the scope and duration of the stop did not exceed that of an ordinary traffic stop.  Therefore, the currency and cellular telephones seized from the Defendant on January 7, 2010, should not be suppressed.

**CONCLUSION**

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that Defendant **Nathaniel Holt, Jr.'s** Motion to Suppress Stop and Search of Vehicle and Seizure of U.S. Currency on June 27, 2007 (DE 225) be DENIED and Motion to Suppress Stop and Search of Vehicle of U.S. Currency on January 7, 2010 (DE 226) be DENIED.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Robin S. Rosenbaum, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein.  LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 6th day of September, 2012.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record